# In the United States Court of Federal Claims

No. 26-282C
Filed: June 2, 2026
FOR PUBLICATION

| | |
|---|---|
| **SIEMENS GOVERNMENT TECHNOLOGIES, INC.,** | |
| *Plaintiff,* | |
| **v.** | |
| **UNITED STATES,** | |
| *Defendant.* | |

*Michael Bhargava* and *Logan Kemp*, Nichols Law LLP, Washington, DC, for the plaintiff.

*Matthew Roche*, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

## MEMORANDUM OPINION

### *HERTLING*, Judge

The plaintiff, Siemens Government Technologies, Inc. ("Siemens"), filed this breach-of-contract case against the defendant, acting through the U.S. Army Corps of Engineers ("the Corps"). Siemens alleges that the Corps violated its contractual obligations regarding the award of an energy savings performance contract ("ESPC") at Army bases in Wiesbaden, Germany.

ESPCs are performance-based contracts between a federal agency and an Energy Service Company ("ESCO") to conserve energy at government facilities. ESPCs allow federal agencies to enter multi-year contracts with ESCOs to achieve savings on the cost of energy; these savings on energy costs are then used to offset the payments due to the ESCOs under the ESPCs.

Siemens brings two claims: first, that the Corps violated its obligations under an implied-in-fact contract to consider bids "fairly and honestly"; second, that the Corps violated provisions of the Federal Acquisition Regulations ("FAR") requiring agencies to conduct business with integrity, fairness, and openness, and to provide offerors a fair opportunity to compete. Siemens claims that it unnecessarily incurred $2,179,177 in bid-preparation costs for an ESPC task order that became nonviable and was therefore not issued due to a failure of the Corps to coordinate internally. Siemens alleges that the Corps' internal lack of coordination breached the obligations identified above. For relief, Siemens seeks to recover its bid-preparation costs.

The defendant moves to dismiss under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that Siemens's claims are barred by the provision of

the Federal Acquisition Streamlining Act of 1994 ("FASA") that bars protests in this court in connection with the award of task orders. The defendant also argues that, even if FASA does not bar the claims, the complaint fails to state a claim and must be dismissed under RCFC 12(b)(6) because: (1) the ESPC contract at issue forecloses any implied-in-fact contract on the same subject; (2) the ESPC contract bars recovery of bid-protest costs; (3) the Corps did not owe Siemens a duty to "coordinate internally"; and (4) the alleged regulatory violations do not create an enforceable right of action.

To be barred by FASA, a claim must be "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). As FASA's task-order bar has been interpreted by the Federal Circuit and other judges of this court, Siemens's claims are not directly or causally connected to the issuance or non-issuance of a task order. Siemens would need to challenge either the task order's terms or the Corps' decision not to award Siemens the task order to draw such a connection. Instead, Siemens seeks reimbursement for its bid-preparation costs. As a result, FASA does not bar Siemens's claims.

Siemens fails, however, to state a viable claim. The complaint alleges no dishonest or misleading conduct by the Corps and, at most, describes routine procurement decisions that cannot form the basis for liability under the facts as alleged. Siemens's claim under the FAR also fails, as the Corps did not violate any duty imposed by the FAR. Accordingly, the complaint is dismissed under RCFC 12(b)(6).

## I.    FACTUAL BACKGROUND

### A. The ESPC Program

Section 8287 of title 42 of the U.S. Code authorizes federal agencies to use ESPCs as an alternative-financing mechanism to pay for energy-conservation measures. The statute spells out in detail an iterative process under which agencies may develop and issue task orders to ESCOs to implement ESPCs. Prospective contractors must follow this process. To obtain an ESPC task order, a contractor must "conduct a site survey, investigation, feasibility design and study, or similar assessment for the purpose of allowing the contractor to submit a firm, fixed-price proposal to implement specific energy conservation methods." 42 U.S.C. § 8287(c)(1)(D)(ii).

The statute establishes a two-step procurement process for ESPCs. First, an agency awards an umbrella Indefinite-Delivery Indefinite-Quantity ("IDIQ") contract to qualified ESCOs. The IDIQ contract makes the participating ESCOs eligible to bid on ESPCs. *See* 42 U.S.C. § 8287(b). Next, when agencies have identified potential energy-saving projects, they may solicit bids from among the ESCOs that have been awarded the IDIQ contract and award task orders for energy-conservation projects at federal facilities. 42 U.S.C. § 8287(c). ESPC task orders require no up-front capital costs from the agency. Instead, the ESCO awarded any ESPC task order must cover the initial capital costs and are then compensated based on the agency's energy-cost savings. 42 U.S.C. § 8287(a)(1).

The Department of Energy ("DOE") has promulgated a rule implementing the statute and establishing the administrative framework and contract structure for ESPCs. 10 C.F.R. pt. 436, subpt. B (2025). During an ESPC task-order procurement, a federal agency issues a solicitation detailing its proposed ESPC project and the projects parameters. The procedures for awarding

task orders, as well as the evaluation factors and their relative importance, are also set out in the solicitation for the contract at issue.  This summary will refer to the specific elements of this procurement; these elements are consistent with the DOE regulations and reflect the standard process for issuing an ESPC task order.

The performance work statement for this procurement sets out the proposed energy-conservation measures ("ECMs") that Siemens's "proposal must discuss."  (ECF 8-1 at 150.)  Once Siemens submitted its proposal, the Corps would invite Siemens to move forward to the next phase of the task-order procurement.  At this stage in the procurement, Siemens has not been awarded the task order.  Rather, Siemens has only been invited to conduct a Preliminary Assessment ("PA"), which is a comprehensive energy audit to identify additional potential ECMs.

A PA culminates in a Preliminary Assessment Report ("PAR"), submitted to the contracting officer.  The PAR includes the results of the energy audit, as well as the ESCO's recommendation about whether a detailed feasibility study ("DFS") is warranted.  A DFS uses information, data, and feedback from the Corps to design and propose ECMs with "a guarantee that the improvements will generate savings sufficient to pay for the project over the term of the contract."  (*Id*. at 50, 53, 83.)  Following the submission of the PAR, the Corps would decide whether to invite Siemens to conduct a DFS.  (*Id*. at 52, 82.)

In conjunction with the DFS, Siemens was to submit an energy-conservation proposal that would outline energy consumption and savings, cost-savings calculations, a financing structure, a contractor-payment approach, and overall proposed pricing.  After reviewing the proposal, the Corps would decide whether to move forward.  If the Corps moved forward with the project, it would then enter negotiations with Siemens to establish mutually agreed-upon terms and conditions of a firm, fixed priced task order.  (*Id*. at 52.)  Only after "an agreement has been reached between the Corps and [Siemens], approval to proceed with the project at [Siemens's] own expense is provided and a task order is awarded."  (*Id*. at 84.)

## B.  Siemens's IDIQ Contract with the Corps

On April 4, 2014, the Corps issued a solicitation "for the design, construction, and operation of energy savings projects to help meet mandated energy savings goals."  (*Id*. at 4.)  The solicitation provided that the services would be acquired "for performance at Government installations or facilities throughout the Contiguous United States, and for Outside the Contiguous United States locations in Alaska, Hawaii, Republic of the Marshall Islands, U.S. Territories and Possessions, Germany, and South Korea."  (*Id*.)  Under the solicitation "[a]ll task orders w[ould] be issued as firm fixed-price" contracts, and, outside of three limited exceptions not applicable here, the contracting officer "must give each ESCO a fair opportunity to be considered" for any task order.  (*Id*.)

The performance work statement provides that the contract "is intended to promote the use of renewable energy technologies, acquire energy and water conservation services, reduce energy and water consumption and/or associated utility costs."  (*Id*. at 45.)  On May 8, 2015, the Corps awarded umbrella IDIQ ESPC No. W912DY-15-D-0050 (the "IDIQ Contract") to Siemens.

3

As relevant here, the IDIQ Contract contains provisions that limit the Corps' obligations to Siemens during the task-order procurement. The IDIQ Contract includes a provision specifically exempting the Corps from liability "for any costs associated with [PAR] audits or preparation of the [PAR] unless the project addressed by the [PAR] later becomes a [task order] award." (*Id*. at 52.)

The IDIQ Contract provides that once the contracting officer has accepted the PA, "the ESCO, at the ESCO's risk may conduct and develop a feasibility study/proposal." (*Id*.) At this point, both parties retained the right to walk away from the project. (*Id*.; *see also id*. at 84.) "If the ESCO determines after beginning [the DFS] that the effort has no potential, the ESCO may cancel the project" and notify the contracting officer indicating the reasons for the cancellation. (*Id*. at 52.) Otherwise, if the contracting officer determines that the project is not feasible for any reason, including, but not limited to, "financial, technical, contractual, savings determination, installation mission, or organizational issues, then the agency will not be subject to any costs associated with the feasibility study," unless the Corps exercises an option in the IDIQ Contract to obtain ownership of the submitted documentation. (*Id*.)

Section H.3.2 of the IDIQ Contract further provides that "[t]he Government will not be responsible for any costs incurred, such as proposal preparation costs or the costs incurred in conducting the Feasibility Study, unless a [task order] is awarded or authorized by the [contracting officer]." (*Id*. at 84.)

## C. The Wiesbaden Project

On October 11, 2019, the Corps issued a solicitation (RFP No. W912DY19R0183) for energy-savings initiatives at the Army Garrison in Wiesbaden, Germany. The solicitation included a list of supplies or services and prices of the type that might be explored in a PA. The nineth item, entitled Distributed Generation, included in its description "ECMs such as Cogeneration systems installation, Microturbines installation, and Fuel cells installation." (*Id*. at 14.) On May 15, 2020, the Corps issued to Siemens an "award notice" in which it informed Siemens it had been selected as the ESPC contractor. The award notice directed Siemens to proceed to the PA.

On October 15, 2020, Siemens submitted a 174-page PA outlining proposed energy-conservation measures and offering calculations of potential energy savings. On May 17, 2021, the Corps issued Siemens a notice to proceed to prepare the DFS. The notice included 21 proposed ECMs that Siemens was required to evaluate in the DFS and a separate list of 13 measures that Siemens was to investigate further. (ECF 1 at ¶ 21.)

Among its required ECMs, the notice included ECM 9.01, "Clay Kaserne Distributed Generation Resiliency." (*Id*. at ¶ 22.) ECM 9.01 provided for "the installation of a combined power and heat source, as well as a microgrid at a site called Clay Kaserne." (*Id*.) According to the complaint, ECM 9.01 was critical to the overall Wiesbaden ESPC. (*Id*. at ¶ 24.) ECM 9.01 "would increase energy resiliency at the Wiesbaden base and generate savings by reducing the amount of energy needed from local utilities." (*Id*. at ¶ 22.) The PA estimated that ECM 9.01 constituted 25 percent of the estimated savings on the cost of energy to the Army under the ESPC. (*Id*. at ¶ 23.)

In January 2022, a month before the DFS was due, the Corps provided Siemens with an updated notice to proceed with the DFS. The updated notice reduced the list of ECMs Siemens was required to consider in the DFS. ECM 9.01 was one of the measures the Corps directed Siemens to remove from the DFS. (*Id*. at ¶ 31.)

Siemens alleges that the Corps removed ECM 9.01 from the notice to proceed because the Corps failed to coordinate properly with two Army organizations affected by the ESPC. Siemens alleges that the 66th Military Intelligence Brigade ("66-MI"), based at the Wiesbaden Army Airfield, prioritized ECM 9.01 because 66-MI was "responsible for computer networks and other systems that required resilience." (*Id*. at ¶ 29.) Siemens alleges that a second organization, the Army Directorate of Public Works ("DPW"), responsible for construction, maintenance, and repair of all Army facilities in Wiesbaden, opposed ECM 9.01 "because it would reduce the amount of energy needed from local utilities, which would force DPW to alter its existing contracts." (*Id*.) Staff from Siemens had met with representatives from both the 66-MI and DPW during the earlier PA process. (*Id*. at ¶ 28.)

As a result of the conflicting interests of the two Army organizations and the Corps' failure to resolve the dispute between them over the desirability of ECM 9.01 until late in the DFS process, Siemens expended significant resources to develop a proposal that would become unviable once ECM 9.01 was removed. Siemens's DFS, submitted on February 2, 2023, only proposed five energy-conservation measures that Siemens considered "financially viable." (*Id*. at ¶ 33.) Following its review of the DFS, the Corps decided not to move forward with the project and cancelled the task order RFP. (*Id*. at ¶ 34.)

## II.   PROCEDURAL HISTORY

Siemens filed this action as a bid protest under 28 U.S.C. § 1491(b) on February 19, 2026. (ECF 1.) On April 2, 2026, the defendant moved to dismiss under RCFC 12(b)(1) and 12(b)(6). (ECF 8). Siemens responded on April 30, 2026 (ECF 10), and the defendant replied on May 18, 2026. (ECF 12.) Oral argument was held on May 27, 2026. At the close of oral argument, the Court rendered an oral ruling. This opinion explains that oral ruling.

## III.   STANDARD OF REVIEW

Under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). It is the plaintiff's burden to establish by a preponderance of the evidence that subject-matter jurisdiction exists. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings. *Id*. (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).

Under RCFC 12(b)(6), dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle [the claimant] to a

legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  A court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party.  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

## IV.    DISCUSSION

### A. The Parties' Arguments

Siemens alleges that the Corps violated its obligations under an implied-in-fact contract and under the FAR to treat Siemens fairly by inducing Siemens to incur substantial costs and then using those costs to justify a decision not to proceed with the task order.  Siemens claims that the Corps induced it to incur substantial costs developing ECM 9.01, even though the Corps knew there was an unresolved disagreement between 66-MI and DPW over that provision.

According to Siemens, the Corps initially proposed ECM 9.01 in its solicitation with the knowledge that: (1) without ECM 9.01, the ESPC was not viable; and (2) the Corps did not have support from the necessary Army components.  Although the internal dispute remained unresolved, the Corps asked Siemens to proceed with the PA.  Once the PA was completed, the Corps, though it still lacked approval from the affected constituent parts of the Army, invited Siemens to incur additional costs and move forward with the DFS.  When the disagreement between 66-MI and DPW was eventually resolved in DPW's favor, removing ECM 9.01.  The resulting loss of 25 percent of the energy savings rendered the ESPC unviable.  As a result, the Corps decided not to move forward with the project.

The defendant argues that the court lacks jurisdiction over the claims due to FASA's task order bar.  Under FASA, the Court of Federal Claims lacks jurisdiction under 28 U.S.C. §1491(b) to consider a protest "in connection with the issuance or proposed issuance of a task or delivery order."  41 U.S.C. § 4106(f)(1).  The defendant argues that Siemens's claims are barred because under the structure of the ESPC program, Siemens is challenging a decision not to proceed with the award of a task order.  The defendant argues that Siemens's complaint is necessarily "in connection with the award of a task order" and therefore barred by FASA.

Siemens responds that FASA only applies to the issuance or proposed issuance of a task order; FASA does not otherwise apply to any action related to a task order.  Because it seeks only to recover its development costs for the PA and DFS, Siemens argues that it is not challenging the decision not to award the task order.  Under this logic, FASA does not bar the claims.

The defendant also contends that even if FASA does not bar this action, dismissal is required under RCFC 12(b)(6) because the complaint fails to state a claim.  The defendant argues that: (1) the ESPC contract itself precludes the existence of any implied-in-fact contract dealing with the same subject matter; (2) the ESPC contract expressly prohibits recovery of bid-preparation costs; (3) the Corps owed no duty to Siemens to "coordinate internally"; and (4) the alleged FAR violations do not create judicially enforceable rights.  (ECF 8 at 39-49.)

Siemens responds that an implied-in-fact contract to consider its proposal fairly and honestly is not precluded by the applicable provision of the IDIQ Contract, as the legal duty to treat offerors fairly is not specifically enumerated in it, and, therefore, that contract does not govern Siemens's claims.  (ECF 10 at 27.)

### B.  Prior Siemens ESPC Protests

This is not the first protest Siemens has brought in this court under 28 U.S.C. § 1491(b) seeking damages for costs incurred in preparing ESPCs for which task orders were not issued, or issued only for a portion of the projects covered by Siemens's preparatory work.  Siemens has filed three such cases, and in each the defendant moved to dismiss, arguing that FASA foreclosed jurisdiction over the protest.

In *Siemens Gov't Techs., Inc. v. United States*, 176 Fed. Cl. 450 (2025) ("*Siemens I*"), Siemens sued to recover costs it incurred conducting PAs and related energy-conservation audits for two of six Navy bases identified in the initial solicitation, when the Navy failed to include the two bases in the final task order because it had duplicate contracts.  In resolving the defendant's motion, Senior Judge Smith reviewed the remedy sought by Siemens and concluded that FASA's "'in connection with' element [is linked] to the form of relief requested by a plaintiff." *Siemens I*, 176 Fed. Cl. at 459 (citing *SRA Int'l, Inc.*, 766 F.3d 1409, 1414 (Fed. Cir. 2014)).  In rejecting the defendant's motion to dismiss under FASA, Senior Judge Smith held that FASA did not apply because the plaintiff's claim and the relief being sought did "not assert the wrongfulness of, or seek to set aside, any task order." *Id.* (quoting *Percipient.ai, Inc. v. United States*, 104 F.4th 839, 847 (Fed. Cir.), *reh'g en banc granted*, 121 F.4th 1311 (Fed. Cir. 2024) (mem.), *on reh'g* 153 F.4th 1226 (Fed. Cir. 2025) (en banc), *cert. denied*, No. 25-435 (Jan. 12, 2026)).  Instead, "[Siemens] only wishes to be made whole after being led astray by the U.S. Navy's false procurement needs—a claim FASA does not bar." *Id.* at 457.  Because Siemens was neither attempting to "rescind the non-redundant task order [nor] block award of a task order," *id.* at 459, the motion to dismiss under FASA's task order bar was denied.

In *Siemens Gov't Techs., Inc. v. United States*, 177 Fed. Cl. 165 (2025) ("*Siemens II*"), Siemens sued to recover its bid-preparation costs for a prospective ESPC at Spangdahlem Air Force Base in Germany.  Siemens alleged that during the preliminary processes, the Corps repeatedly changed its requirements, failed to provide necessary information, and delayed investigating whether German labor regulations would apply to the project.  After Siemens had spent approximately $3 million preparing assessments and audits, the Corps canceled the project when it discovered the labor regulations applied.  The defendant again moved to dismiss under FASA.  As Siemens was only seeking to recover its bid-preparation costs spent in pursuit of the task order, Senior Judge Bruggink concluded, as had Senior Judge Smith, that Siemens's claims were not foreclosed by FASA.  The complaint was not directly and causally connected to the issuance of a task order because "[a]ll it asks is that defendant cover [Siemens's] bid preparation costs, a claim which is not connected directly to the issuance of task order." *Id.* at 173-4 (citing *Siemens I*, 176 Fed. Cl. at 459 and *Percipient.ai*, 104 F.4th at 851).  Because Siemens was not challenging the task order's provisions or the defendant's decision not to award the task order, FASA did not bar the claims.

Finally, in *Siemens Gov't Techs., Inc. v. United States*, No. 24-1313, 2025 WL 3774760 (Fed. Cl. Dec. 31, 2025) ("*Siemens III*"), Siemens sued to recover the development costs it

incurred on a proposal for the Defense Logistics Agency ("DLA") for the construction of a power plant at an Air Force base. DLA repeatedly required Siemens to redo its energy-project audit with new pricing assumptions, and each time Siemens warned DLA that the revisions would impose significant costs that could undermine the project's viability. Ultimately DLA issued a stop work order. Once again, the defendant moved to dismiss, invoking the FASA bar. Judge Meyers, relying in part on *Siemens I* and *Siemens II*, again focused his analysis on the remedy sought, finding that Siemens was seeking only the repayment of allegedly unnecessary expenses incurred because of DLA's improper conduct during the procurement process. Judge Meyers concluded, as had Senior Judge Smith and Senior Judge Bruggink, that "[b]ecause Siemens' claims are not 'directly and casually connected' to the issuance of a task order and the requested relief would leave the task order unaffected, the FASA bar does not apply." *Siemens III*, 2025 WL 3774760, at *6.

### C. FASA Does Not Bar Siemens's Claims

The issue presented by the defendant here in its motion to dismiss for lack of jurisdiction is the same one addressed in Siemens's three previous cases seeking ESPC bid-preparation costs, and the result is the same. FASA does not bar Siemens's claims for bid-preparation costs, and the motion to dismiss under RCFC 12(b)(1) is denied.

FASA provides that a "protest is not authorized *in connection with the issuance or proposed issuance of a task or delivery order*." 10 U.S.C. § 3406(f)(1) (emphasis added). The Federal Circuit has interpreted this language to mean "that a protest is barred if it challenges the issuance of the task order directly or by challenging a government action (*e.g.*, waiver of an organizational conflict of interest) whose wrongfulness would cause the task order's issuance to be improper." *Percipient.ai, Inc. v. United States*, 104 F.4th at 847.[1]

The "mere connection to a task order . . . is not enough for FASA to apply." *Siemens II*, 177 Fed. Cl. at 172 (citing *Percipient.ai*, 104 F.4th at 849). A protest must relate to the "issuance or proposed issuance of a task order" before FASA will bar the suit. *Id.* (cleaned up). Although FASA bars challenges to "government action[s] in the direct causal chain sustaining the issuance of a task order," not "all actions taken under or after issuance of a proper task order" are "directly and casually connected" to a task order's issuance. *Percipient.ai*, 104 F.4th at 850.

Because the en banc order deprives the *Percipient.ai* panel opinion of precedential effect, *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1414 (Fed. Cir. 2014), remains the controlling

---

[1] In *Percipient.ai*, the Federal Circuit granted the government's petition for rehearing en banc, vacated the panel opinion, and reinstated the appeal. *Percipient.ai, Inc. v. United States*, 121 F.4th 1311 (Fed. Cir. 2024). The en banc rehearing was limited to the issue of *Percipient.ai*'s standing, and the order granting rehearing expressly noted that "[t]he court will not revisit and does not require additional briefing on the" FASA bar. *Id*. at 1312. Ultimately, the en banc Federal Circuit rejected the panel's conclusion on standing, dismissing the protest. *Percipient.AI, Inc. v. United States*, 153 F.4th 1226 (Fed. Cir. 2025), *cert. denied*, No. 25-428 (Jan. 12, 2026). Although the panel opinion has no precedential effect, it remains persuasive authority, given that the en banc Federal Circuit declined to reconsider the FASA issue. *See Radiance Techs., Inc. v. United States*, 174 Fed. Cl. 197, 202 n. 3 (2024).

authority.  In *SRA*, the Federal Circuit held that the phrase "in connection with the issuance of a task order" is to be interpreted broadly but must be informed, in part, by the nature of the relief sought.  *Id*.  While not dispositive, the remedy being requested can serve as an aid in evaluating whether a protest is directed at the issuance or proposed issuance of a task order.  If a protest is so directed, then FASA bars it; if a protest is not so directed, FASA is inapplicable.  Applying that test in *SRA*, the Federal Circuit held that a challenge to a post-award waiver of an organizational conflict of interest was directly connected to the issuance of the task order because the protestor was seeking "rescission of the task order's issuance."  *Id*.  The dismissal in *SRA* does not support the proposition that the FASA bar applies to any and everything touching on a task order.  If *SRA* were to be read so broadly, it would be internally inconsistent, as there would never be a need to analyze the relief sought in a protest, because any protest touching on a task order would be covered by the FASA bar.  The defendant's approach to the breadth of the FASA bar stretches *SRA* beyond its breaking point.

Post-*Percipient.ai* decisions analyzing the FASA task-order bar have adopted and applied the *SRA* approach in dismissing protests challenging the terms of the solicitation or seeking a new evaluation of proposals or an order requiring an agency to allow additional offers.  All these challenges would have directly affected the issuance or proposed issuance of a task order.  *See*, *e.g.*, *Radiance Techs.,* 174 Fed. Cl. at 204; *Prime Physicians, PLLC v. United States*, 174 Fed. Cl. 190, 196 (2024); *Computer World Servs. Corp. v. United States*, 173 Fed. Cl. 582, 586 (2024).

As in its three other cases, Siemens is neither challenging the Corps' decision not to award the task order nor seeking an order reinstating the procurement, reopening the evaluation of its proposal, or awarding it the task order.  Any decision in connection with Siemens's claims will have no effect on the issuance or proposed issuance of a task order because Siemens is not challenging either "the issuance of the task order" or "a government action . . . whose wrongfulness would cause the task order's issuance to be improper."  *Percipient.ai*, 104 F.4th at 847.

Instead, Siemens seeks only to recover the costs it spent on the procurement attributable to the alleged violation by the Corps of an implied-in-fact contract and provisions of the FAR.  Any award of compensation for these costs does not require review of the decision not to award Siemens the task order.  The relief requested in the complaint would leave the decision not to award the task order unaffected.  Under *Percipient.ai* and *SRA*, the nature of the relief sought by Siemens is sufficient to sidestep the FASA bar.

## D.  Siemens fails to state a claim

Rejection of the defendant's jurisdictional defense requires consideration of its proffered alternative basis for dismissal.  On this score, the defendant is more successful.  The complaint fails to allege facts plausibly suggesting that the Corps breached an implied-in-fact contract or violated its obligations under the FAR.  The motion to dismiss for failure to state a claim is granted.

In *Heyer Prods. Co. v. United States*, 135 Ct. Cl. 63, 71 (1956), the Court of Claims, whose decisions remain binding on the Court of Federal Claims, held "[t]he Government is under the obligation to honestly consider" an offeror's bid "and not to wantonly disregard it."

Moreover, "if this obligation is breached and [the] plaintiff is put to needless expense in preparing its bid, it is entitled to recover such expenses." *Id*. When an agency's conduct "is found to be 'arbitrary and capricious toward the bidder-claimant,'" the government breaches its duty to the offeror. *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998) (quoting *Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995)).

Siemens alleges that "the Government failed to act in good faith" and "violated the Government's implied-in-fact contract duty to treat Siemens honestly and fairly for the task order procurement." (ECF 1 at ¶ 38.) In its reply, the defendant argues that the true nature of Siemens's protest is as an implied-in-law contract claim, under a theory of detrimental reliance. (ECF 12 at 15.) If the defendant is correct, dismissal for lack of jurisdiction would be appropriate. *See Hercules Inc. v. United States*, 516 U.S. 417 (1996) (no jurisdiction to consider claims, such as detrimental reliance, based on an implied-in-law contract).

The first problem Siemens faces is that the IDIQ Contract specifically addresses the question at issue. Under that contract, Siemens may not recover its bid-preparation costs, and its claim is expressly foreclosed. Siemens alleges no breach of that contract, and no violation by the Corps of any duty under the IDIQ Contract. "[T]he existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002). The nature of Siemens's putative implied-in-fact contract fits neatly under the applicable provision of the express contract, for which no breach is alleged.

The IDIQ Contract is explicit that the ESCO, Siemens here, must conduct and develop its proposal at its own financial risk, while simultaneously preserving the right of the government to walk away without penalty. (ECF 8-1 at 52.) The IDIQ Contract explicitly exempts the government from liability "for any costs associated with [PAR] audits or preparation of the [PAR] unless the project addressed by the [PAR] later becomes a [task order] award." (*Id*. at 50.) The IDIQ Contract also absolves the government from liability for "any costs associated with the feasibility study" if the contracting officer determines that the project is not feasible for any reason, "including but not limited to financial, technical, contractual, savings determination, installation mission, or organizational issues." *Id*. These are the governing provisions of the contract to which Siemens agreed and to which it is bound. The IDIQ Contract grants the Corps the ability to determine whether the project is for any reason not feasible.

Because the contract underlying this dispute forecloses its claim, Siemens must try to bootstrap its way into an implied-in-fact contract. Siemens argues that its claim is unrelated to the express contract. Its claim, it posits, is based on an alleged violation of the implied-in-fact contract to treat offerors honestly and fairly that inheres when an agency conducts a procurement.

Even assuming that Siemens is correct that the Corps owed an implied-in-fact contractual duty to treat Siemens fairly and honestly, and taking the allegations in the complaint as true, Siemens still fails to state a claim.

The complaint does not allege any conduct by the Corps that plausibly suggests that the Corps did not treat Siemens fairly and honestly or took any arbitrary or capricious action against

Siemens.  The complaint contains no allegations that the Corps misled Siemens, acted dishonestly, or otherwise engaged in conduct that improperly induced Siemens to incur additional costs.

The circumstances here are readily distinguishable from *Heyer* and Siemens's prior cases, that contained allegations of duplicative procurements, conflicting instructions, or affirmative misconduct by the government.  Instead, the complaint reflects routine procurement decisions and internal challenges that are insufficient to give rise to liability.

In *Heyer*, the court awarded bid-preparation costs when the agency misled the offeror about the agency's sincerity in soliciting it.  135 Ct. Cl. 63 (1956).  As alleged, the "advertisement for bids was a sham, done only to appear to comply with the law." *Id*. at 69-70.  The court held that "[i]t was an implied condition of the request for offers that each of them would be honestly considered." *Id*. at 69.  As a result, the plaintiff had alleged sufficient facts to maintain an action for damages for breach of the implied duty.

In *Siemens I*, the plaintiff alleged that the Navy had previously awarded contracts to another entity for the same services being sought, "duplicat[ing] and directly undermin[ing] the scope of work for the projects." 176 Fed. Cl. at 454.  Senior Judge Smith concluded that Siemens had sufficiently alleged that it was "led astray by the U.S. Navy's false procurement needs." *Id.* at 457.  The claim was allowed to proceed.

In *Siemens II*, the plaintiff alleged a detailed recitation of repeated discussions and a failure of the contracting agency to prevent additional, unnecessary expenses, despite Siemens's warnings.  Senior Judge Bruggink concluded that Siemens had plausibly alleged that:

> [The Corps] wasted Siemens'[ ] time and resources preparing an audit that Spangdahlem Command did not want. [ ]  Worse . . . , it asked for a third audit—which Siemens completed—even though it knew the Air Force was likely going to cancel the solicitation. [ ]
>
> In short, Siemens plausibly alleges a breach of contract in that, but for [the Corps'] refusal to timely meet with German officials, provide energy statistics, and ascertain what kind of audit Spangdahlem needed, Siemens would not have spent approximately $3,000,000 on a project destined to go nowhere.

*Siemens II*, 177 Fed. Cl. at 175.

One difference between *Siemens II* and the claim at bar is that the contract at issue in *Siemens II* left the award of bid-preparation costs to the discretion of the contracting officer.  The complaint there alleged a direct breach of the underlying contract because the denial of those costs was arbitrary and capricious. *Id*. at 174.  Here, the contract expressly forecloses recovery of bid-preparation costs.  Thus, as explained above, Siemens cannot plead a breach of the contract but must, instead, plead breach of an implied-in-fact contract.

In *Siemens III*, during the design of energy-saving measures at an Air Force base, Siemens repeatedly "explained to the Government the significant cost its direction would

11

impose" but was directed by the government to continue work on the project, even as the government's requirements changed. *Siemens III*, 2025 WL 3774760, at *2. This process was repeated until the government eventually issued a stop work order.

Here, the allegations do not approach in severity the threshold that has enabled Siemens to avoid dismissal of its prior ESPC cases. Siemens makes no allegation that the Corps intentionally misled it, like the "sham" in *Heyer*. Siemens does not allege that it incurred costs because the Corps had awarded the contract to another provider or concocted "false procurement needs." *See Siemens I*, 176 Fed. Cl. at 457. Siemens also does not allege that the Corps gave conflicting instructions or requested that Siemens proceed over objections that further work would incur additional costs.

Instead, the plaintiff's complaint merely alleges that the Corps "failed to resolve [an] internal dispute, which was central to whether an energy conservation project at Wiesbaden could be economically viable." (ECF 1 at ¶ 30.) There is no allegation that the Corps was aware that this dispute would render the project nonviable. Siemens has also not alleged that the Corps knew, before the resolution of the internal dispute and subsequent notification to Siemens, that ECM 9.01 would need to be removed from the DFS . Indeed, Siemens alleges that it met with representatives of both 66-MI and DPW during the preparation of the PA. (*Id*. at ¶ 28). Siemens could have raised its concerns about proceeding with the preliminary aspects of the work until that dispute was resolved, but it did not. Instead, it proceeded, at its own risk, to undertake the PA and DFS, while the Corps continued its efforts to resolve the dispute between 66-MI and DPW. Both Siemens and the Corps apparently hoped for a favorable outcome, but only in hindsight is it obvious the parties, including Siemens, were too optimistic.

What occurred here is contemplated by the structure and nature of the ESPC process. The statute and the IDIQ Contract anticipate an iterative process between the procuring agency and the ESCO. Nothing is final until the end of the lengthy process. Siemens signed up for this program and knew, or should have known, that it bore the risk that the planning stage would not result in a task order. The only thing Siemens alleges the Corps did wrong that could violate any duty it owed to Siemens was that it did not resolve the dispute between the two Army components before embarking on the process. Had the Corps known at the outset that ECM 9.01 would not remain an element of the project, Siemens's complaint would resemble those on which Siemens has been allowed to overcome motions to dismiss. Siemens makes no such allegation. Instead, Siemens is complaining about routine government operations. That risk is assumed by participating in the ESPC program under the terms and conditions of the IDIQ Contract. If a complaint predicated on the thin allegations presented here can proceed, the iterative process contemplated by the ESPC program would either wither or be delayed until everything is just right (a process that could take years). Further, acceptance of Siemens's position would effectively provide ESCOs with a guarantee: either they get the task order or the agency has to pay their bid-preparation costs, even when the IDIQ contract precludes payment of those costs..

The Corps complied with the express terms of the contract to which Siemens is bound. Rather than live with the bargain it struck, Siemens tries to create an element of wrongdoing by the Corps when none exists. Siemens seeks to turn a program that places the risk on the offeror back squarely on the government, in direct contravention of the express terms of its contract,

despite the government agency functioning in a way that agencies often do, putting off a final decision until the moment when the decision must be made. Such a thin reed fails to state a claim on the facts alleged, which differ from the allegations in Siemens's prior cases.

For the same reason, Siemens's claim under the FAR fails. Siemens contends that the Corps violated FAR 16.505 by failing to provide it with a fair opportunity to compete for the task order. Siemens further claims that the Corps violated FAR 1.12 and FAR 1.102-2(c) by failing to conduct its business with integrity, fairness, and openness.

Whether FAR 1.102-2(c) is judicially enforceable remains open, because "cautionary and informative regulations and directives provide only internal governmental direction" and therefore do not provide a remedy for private parties in a judicial forum." *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002). Some cases hold that FAR 1.102-2(c) is judicially enforceable. *E.g.*, *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 664 (2021), aff'd on other grounds, No. 2021-2279, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023). Other cases hold the opposite. *E.g.*, *Harmonia Holdings Grp. v. United States*, 145 Fed. Cl. 84, 91 (2019). If the provision is judicially enforceable, the burden of proving a violation is also an open question. *See Ceres Env'l Servs. v. United States*, 158 Fed. Cl. 547, 566 (2022). Likewise, whether FAR 1.12 is judicially enforceable appears to be unresolved. This case does not present a need to resolve these open questions, because even if the provision is judicially enforceable, Siemens cannot prevail under any burden of proof.

Nothing in the complaint reflects that Siemens was denied a fair opportunity, or that the Corps failed to conduct the procurement with integrity, fairness, and openness. The crux of Siemens's argument is that the Corps: (1) knew that ECM 9.01 was crucial to the overall success of the Wiesbaden project due to its projected cost savings; and (2) gave Siemens notice to proceed to the DFS (and incur additional costs) while an ongoing internal dispute about ECM 9.01 was unresolved. Siemens had met with both 66-MI and DPW and was presumably aware of the dispute over ECM 9.01; indeed, the complaint is notably silent on what Siemens knew and when it knew it. An agency does not fail to act with integrity or fairness merely because a plaintiff relies on the expectation that an agency will resolve an internal disagreement on an issue in the plaintiff's favor and is ultimately unsuccessful.

The general rule is that agencies are free to determine their needs and may cancel a solicitation at any time, provided the cancellation is not arbitrary and capricious. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010). Siemens does not allege that the cancellation itself was arbitrary and capricious, so the general rule, granting broad discretion to the Corps to determine its own needs and how best to obtain or not obtain services to meet those needs, precludes Siemens's claim.

The Corps was expressly permitted under the IDIQ Contract to decline to proceed for any reason, including a determination that the project was not financially viable. The FAR provisions that Siemens relies on neither impose any duty of internal coordination prior to issuing a solicitation nor require an agency to proceed with a project simply because an offeror has incurred costs. In fact, the contract expressly disclaims any such obligation.

13

The decision by the Corps to proceed with the ESPC process while working to resolve an internal disagreement was consistent with the structure of the ESPC program and the FAR. Siemens makes no allegation that the Corps knew when it asked Siemens to incur the costs for which compensation is sought that the DPW position on ECM 9.01 would prevail. In this context, the decision not to proceed with the issuance of the task order did not deprive Siemens of a fair opportunity to compete and does not reflect a failure to conduct business with integrity, fairness, and openness.

## V.    CONCLUSION

Because Siemens's claims are not directly or causally connected to the issuance of a task order, FASA does not bar the plaintiff's claims. The defendant's motion to dismiss under RCFC 12(b)(1) is denied.

The complaint fails, however, to state a viable claim because it does not allege facts plausibly suggesting that the Corps breached any obligation under the contract or violated an implied-in-fact contract duty to treat Siemens honestly and fairly. Siemens alleges no facts showing that the Corps acted dishonestly, misled Siemens, or improperly induced it to incur the costs for which Siemens seeks reimbursement. Instead, Siemens merely disagrees with a decision that the IDIQ Contract expressly allows the Corps to make. Under the IDIQ Contract, the Corps retained discretion to determine that a project was not feasible and to decline for any reason to proceed with it. Not only that, but the IDIQ Contract speaks to the precise claim Siemens brings and expressly forecloses it.

Siemens postulates a duty that the IDIQ Contract expressly rejects, while seeking to transgress the terms of that contract. Siemens is trying to turn the ESPC process into a guarantee that it gets paid, no matter what the outcome. That approach is foreclosed by the IDIQ Contract. If Siemens does not like that conclusion, it is free not to participate further in the EPSC program; it is not free to turn a blind eye to the terms of its agreement because it did not get a return on its investment, through no fault of the Corps. It is this last element that is conclusive. As explained, unlike the allegations in its prior ESPC cases, Siemens alleges no action by the Corps that can be construed in any light as breaching a duty owed to it.

Finally, the FAR provisions that Siemens relies on to support its claims imposed no duty on the Corps to coordinate internally among different Army organizations at any precise stage of the EPSC development process. The FAR provisions also do not obligate the Corps to have proceeded with a task order based on Siemens's costs or expectations. Accordingly, the Corps' decision not to award a task order is not a denial of a fair opportunity to compete or a failure to act with integrity, fairness, and openness.

A separate order reflecting this decision will be entered dismissing the complaint for failure to state a claim but allowing Siemens two weeks to decide whether to seek leave to file an amended complaint.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**

14